No. 761 October 30, 2024 685

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MACKENZIE WILLIAM LEWIS,
*Defendant-Appellant.*

Multnomah County Circuit Court
19CR53040; A179402

Benjamin N. Souede, Judge.

Submitted July 25, 2024.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Brett J. Allin, Deputy Public Defender, Oregon Public Defense Commission, filed the briefs for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Peenesh Shah, Assistant Attorney General, filed the brief for respondent.

Before Shorr, Presiding Judge, Mooney, Judge, and Pagán, Judge.

SHORR, P. J.

Affirmed.

**SHORR, P. J.**

Defendant appeals from a judgment of conviction for one count of riot, ORS 166.015. Defendant raises three assignments of error, asserting that the trial court erred by (1) actively investigating the vote composition of the jury before it had reached a verdict; (2) instructing the jury to keep deliberating after it indicated it was at a deadlock; and (3) refusing to grant a mistrial. For the reasons discussed below, we reject defendant's assignments of error and affirm the judgment of the trial court.

## I.  FACTS

The facts on appeal are largely procedural. Following an incident at a bar in Portland, defendant was indicted on one count of felony riot under ORS 166.015. After closing arguments at the ensuing jury trial, the trial court instructed the jury, in part, to "not tell anyone including me how many of you are voting not guilty or guilty until you have reached a lawful verdict or have been discharged." At 10:36 a.m., the jury began deliberations.

At around 3:30 p.m., after about four hours of deliberations,[1] the jury sent the court this written question: "[I]f one of the jurors says that their decision has been made and that no amount of further discussion or review of evidence, etcetera will change their mind, what do we do? Are there next steps or recommendations? Is hung jury the outcome?" At that point, the prosecutor suggested re-instructing the jury on the requirements for a lawful verdict, in case the jury did not understand that unanimity is required for a guilty verdict but not an acquittal. That is, an 11 to one or 10 to two vote to acquit would be a lawful not-guilty verdict. *See State v. Ross*, 367 Or 560, 561, 481 P3d 1286 (2021) ("Oregon law * * * permits a not-guilty verdict by a vote of 11 to one or 10 to two.").

When asked if he had any response, defense counsel said: "Well, I think that we're where we are. And, bring them in. And it's either going to be a hung jury and retry. Or it's going to be, you know, not guilty." The court then proposed bringing the jury in, inquiring about the vote composition

---

[1] The jury took an hour break for lunch.

and direction, and then questioning each juror whether they believed further deliberations would be useful. Based on the jurors' responses, the court would then determine whether to give the deadlocked jury instruction, Uniform Criminal Jury Instruction 1028.[2] The court made note that defendant would object to giving the deadlocked jury instruction. Before bringing in the jury, the court asked if anyone wished to be heard further, to which defense counsel merely stated that he did not "want [the jury] to feel that they're being scolded or schooled or anything. I think that that has to be very much on the record that they are doing their job."

The court then brought the jurors back in and asked the presiding juror to disclose the jury's current vote, without revealing the direction of the vote. The presiding juror responded that the vote was 10 to two or 11 to one. The court then asked the presiding juror, "[A]m I right in assuming that if—if the ten or eleven votes on the one side; that they can only be votes for guilty because otherwise, the jury would understand that you have a verdict?" The presiding juror confirmed that was correct. The court then asked each juror whether they believed continued deliberation would be useful. All but one juror responded with cautious optimism. The final juror confirmed that he did not believe further deliberation would be productive. Directly following the jury poll, the court stated, "Given the amount of evidence in this case, the jury I think has been deliberating about four hours so far. I think it's appropriate to give you all some more time to continue deliberations." The court then sent the jury back to deliberate further, saying, "I'm not going to give you any additional instructions other than to urge you to continue doing the work and following the instructions that have already been given to you."

---

[2] Uniform Criminal Jury Instruction No. 1028 provides:

"It is your duty as jurors to consult with one another and to deliberate with a view toward reaching an agreement if you can do so without surrendering your individual judgment. Each of you must decide the merits of the case for yourself, but do so only after impartially considering the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views, or to change your opinion, if you are convinced that it is erroneous. But do not surrender your own honest belief as to the weight of the evidence solely because of the opinion of your fellow jurors or merely for the purpose of returning a verdict."

After the jury departed, the court noted that it was "appropriate" to allow the jury to continue deliberations because "the vast majority of the jury seemed to believe that they wanted to and were willing to continue to work." The court further noted that it was mindful of the "very clear duty of the [c]ourt not to coerce the jurors." The trial judge was concerned "that giving a uniform instruction 1028 would be read as coercive," but did not think sending them back merely to continue was coercive. Defense counsel noted that he felt the jury "had plenty of time" and "at least one juror *** was really definite," but that he had "no problem with letting [the jury] go 'til another hour or two." Defense counsel further stated that "if they don't get something by [5:00 p.m.], I am just afraid that even asking them to come back tomorrow is inherently coercive."

Some time after returning to deliberate, the jury sent a note to the court which read: "Asked to have definition of public alarm?" The court responded in writing: "The [c]ourt has provided the jury with all of the definitions it intends to provide. The jury should view this term as carrying its commonly understood meaning."

At 4:55 p.m. the jury had not yet reached a verdict. Court staff had been informed that one juror had to stop for the day at 5:00 p.m. Defense counsel requested that the jury "be excused" rather than return the next day to continue deliberations. Defense counsel noted that his concern was whether the jury would be able to "stay untainted" considering the way the case was "permeating the media." The trial judge responded, "I am not going to discharge the jury at this time and declare a mistrial. I think given the amount of evidence in this case and the amount of time the jury's been deliberating that would not be appropriate." The clerk then went to release the jury for the day with instructions to return the next morning. The jury informed the court that it would like to keep working, and before 5:30 p.m., the jury returned a unanimous guilty verdict after approximately six hours total of deliberation. After the court discharged the jury, defense counsel moved again for mistrial, arguing that the cumulative coercive effect of the court's actions

created a guilty verdict.[3] The court denied the motion for mistrial on the grounds that it was untimely as the trial had ended, and because the timing of deliberations indicated no coercion. The trial lasted eight days and originally involved two other defendants whose motions for judgment of acquittal were granted at the close of the state's case.

## II.   ANALYSIS

### A.   *Inquiry Into the Numerical Division of the Jury*

In his first assignment of error, defendant asserts that the trial court's active investigation of the jury's vote composition was, itself, coercive. In the event we conclude that the argument is not preserved, defendant requests plain error review.

"[A]n issue not preserved in the trial court will not be considered on appeal." *State v. Wyatt*, 331 Or 335, 341, 15 P3d 22 (2000). To preserve an issue for appellate review, a party must provide the trial court with an "objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted." *Id.* at 343. A party "should not be heard to argue that a trial court committed reversible error because it did not rule in that party's favor on a ground never presented to it." *State v. Wideman*, 203 Or App 359, 364, 124 P3d 1271 (2005).

Having reviewed the record, we conclude that defendant did not preserve his argument. Prior to calling the jury back, the trial court informed the prosecutor and defense counsel of its plan to question the jury about its vote, direction, and each juror's feelings regarding the utility of further deliberation. At that time, defense counsel did not object to the court's proposed inquiry.

Moreover, we conclude that the error defendant claims is not plain. *See Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381, 823 P2d 956 (1991) (to qualify for plain error review the error must be "obvious" and "not reasonably in dispute"). Defendant admits that this case presents a novel

---

[3] The transcript reads "course of affect," but defendant clarifies that defense counsel said "coercive effect."

issue regarding whether, in these circumstances, it is coercive for a court to actively investigate the composition of the jury's vote.[4] Defendant fails to cite any controlling law on that issue. We have also found none. Because any error is not obvious or beyond dispute, we will not review defendant's claim of error as plain error. We therefore reject it.

B.  *Instructions to the Jury to Continue Deliberations*

In his second assignment of error, defendant argues that the trial court erred by instructing the jury to keep deliberating after it indicated it was at a deadlock. He contends that the instruction given by the trial court to continue deliberations was a deadlocked jury instruction. *See State v. Marsh*, 260 Or 416, 423, 490 P2d 491 (1971), *cert den*, 406 US 974 (1972) (defining a deadlocked jury instruction as "a supplemental instruction given to encourage deadlocked juries to reach agreement"). Defendant challenges both the form and the factual context of the instruction as coercive. In response, the state argues, in part, that the trial court's instruction to continue deliberations was not a supplemental instruction, and therefore "does not implicate the rules about how to instruct a jury to resolve its deadlock." *State v. Garrett*, 292 Or App 860, 869, 426 P3d 164, *rev den*, 363 Or 744 (2018) (Edmonds, S. J., concurring). The state argues further that even assuming this was a supplemental instruction, it was not coercive. We do not reach the question whether, in these circumstances, the court's direction to continue to deliberate was a supplemental instruction. Assuming without deciding that it was, we conclude that the instruction given was not coercive.

---

[4] We conclude only that there was no plain error. We note that courts outside of Oregon are divided on whether such an inquiry is plain error. The Supreme Court has announced a supervisory rule that applies only to federal courts and is not binding on the states. *Brasfield v. United States*, 272 US 448, 450, 47 S Ct 135, 71 L Ed 345 (1926) (concluding that such an "inquiry itself should be regarded as ground for reversal"); *Locks v. Sumner*, 703 F2d 403, 406 (9th Cir), *cert den*, 464 US 933 (1983) ("[W]e decline to hold that the rule in *Brasfield* is of constitutional dimension."). State courts remain split on the issue. *See, e.g., Gibson v. State*, 272 Ga 801, 803, 537 SE 2d 72, 74 (2000) (adopting a totality of the circumstances approach); *State v. Rickerson*, 95 NM 666, 668, 625 P2d 1183, 1185 (1981) (concluding that judicial inquiry into the numerical division of the jury is not error *per se* and may be necessary in certain circumstances); *Kersey v. State*, 525 SW 2d 139, 141 (Tenn 1975) (concluding that such an inquiry is reversible error).

"We review for legal error whether a supplemental instruction resulted in jury coercion and violated a defendant's constitutional rights to a fair trial and due process." *Id.* at 864. In determining whether a supplemental instruction was coercive, "[w]e consider both the form of the instruction and the factual context." *Id.* at 865. The form of the instruction risks coerciveness if it is directed primarily at members of the minority, is not balanced with a reminder that no juror is expected to abandon conscientiously held opinions, and refers to the necessity or expense of retrial. *Marsh*, 260 Or at 426-27. The "most extreme" instructions are those that inform the jury "that it must continue deliberations until it reaches a verdict or that the trial judge will not declare a mistrial as the result of a deadlocked jury." *Id.* at 427. In determining whether an instruction was coercive, a court should also consider the following contextual factors: (1) the relative weight of the evidence, (2) the trial judge's knowledge of the jury's vote, and (3) the amount of time the jury deliberated before and after the instruction. *Id.* at 428-29.

In support of his assertion that the instruction was coercive, defendant relies primarily on two arguments. First, defendant criticizes the form of the trial court's instructions for not containing language cautioning each juror to hold true to their conscience. Next, defendant focuses heavily on the second contextual factor from *Marsh*—the trial judge's knowledge of the jury's vote composition. The state rejects those arguments, and asserts that the third *Marsh* factor—the timing of deliberation before and after the instruction—indicates that the instruction was not coercive.

In this case, the form of the trial court's instructions did not include the kind of language that *Marsh* considered to be coercive. "The court did not implore the jury to reach a verdict, did not encourage any jurors to reconsider their positions, and said nothing about avoiding the time and expense of retrial." *Garrett*, 292 Or App at 865 (citing *Marsh*, 260 Or at 435-37). Although the instruction "failed to expressly remind jurors to adhere to their own conscientiously held opinions," that omission is not particularly troubling "in light of the noncoercive nature of the instruction's content." *Id.* at 866 (emphasis omitted). The trial court

merely instructed the jury to continue deliberations without giving any further instructions. That is "a directive that is, by its terms, innocuous." *Id.* We therefore conclude that the form of the instructions was not impermissibly coercive.

With respect to the trial court's knowledge of the jury vote, "a trial court's issuance of a supplemental instruction after being informed of the jury's voting posture—if that awareness by the court is itself known by the jury—can have a coercive tendency." *Id.* at 867. But we have rejected a *per se* rule making it reversible error whenever a trial court gives supplemental instructions after learning of the jury's vote. *See State v. Hutchison*, 142 Or App 56, 59, 920 P2d 1105, *rev den*, 324 Or 395 (1996) (declining to adopt such an absolute rule); *Garrett*, 292 Or App at 867 n 8 (rejecting a *per se* rule "that whenever a trial court knows about the jury's voting posture, the court is *** required to remind jurors not to abandon conscientiously held opinions and that a hung jury is acceptable"). Instead, the court's knowledge of the vote composition is a "single circumstance" that "is not dispositive *** where none of the other circumstances support the same conclusion." *Garrett*, 292 Or App at 867.

In concluding that the supplemental instruction was not coercive in *Garrett*, we considered the fact that the trial court expressly reminded the jury not to inform the court of its voting posture. *Id.* Here, the trial court not only failed to remind the jury not to disclose its voting posture, but it actively inquired into the jury's vote. Moreover, the court questioned each juror, in the presence of all the jurors, whether they believed continued deliberation would be useful. Through this interrogation, the likely identity of the holdout juror would have become apparent to the trial court, and the jurors would have understood that the court knew the holdout juror's identity. Although the court's knowledge of the jury's voting posture is not by itself dispositive, the manner in which the trial court acquired that knowledge in this case supports a determination that coercion occurred.

We turn now to the third *Marsh* factor—the timing of deliberations before and after the instruction. Here, the jury deliberated for approximately four hours before the instruction and continued to deliberate for at least another

90 minutes after receiving the instruction. The amount of time spent deliberating after the instruction was issued suggests that the jury was not coerced. *See Garrett*, 292 Or App at 866-67 (no coercion where the jury deliberated an hour and a half after receiving a supplemental instruction); *cf. Hutchison*, 142 Or App at 61 (coercion resulted where the court was aware of the vote and the jury reached a verdict 15 minutes after the deadlocked jury instruction). The third *Marsh* factor favors a conclusion that the instruction did not coerce the jury.

We acknowledge that the factors point in different directions. However, given the neutral form of the instruction to simply keep deliberating and the amount of time spent deliberating before and after the instruction, we conclude that the instruction was not impermissibly coercive. We reject defendant's second assignment of error.

### C.  *Denial of Defendant's Motion for Mistrial*

In his third assignment of error, defendant argues that the trial court erred in denying his motion for mistrial. He argues that the cumulative coercive effect of the trial court's investigatory steps and its supplemental instructions to the jury deprived defendant of his constitutional right to a fair trial. In response, the state argues that, when defendant moved for mistrial because the jury failed to reach a verdict by 4:55 p.m., the jury had not deliberated so long as to warrant the grant of a mistrial.

A denial of a motion for mistrial is reviewed for abuse of discretion. *Garrett*, 292 Or App at 864. "If the trial court's decision was within the range of legally correct discretionary choices and produced a permissible, legally correct outcome, then the trial court did not abuse its discretion." *State v. Rogers*, 330 Or 282, 312, 4 P3d 1261 (2000). "Declaring a mistrial is a drastic remedy to be avoided if possible." *State v. Sell*, 328 Or App 82, 90, 536 P3d 1019 (2023), *rev den*, 372 Or 63 (2024) (internal quotation marks omitted). We have previously concluded that a trial court was "not required to declare a mistrial" where the jury had reached an apparent impasse after five and one-half hours of deliberation in a two-and-one-half day trial. *State v. Claridy*, 29 Or App 435,

439-40, 563 P2d 1239 (1977) (concluding that "the court rea-
sonably concluded that additional discussion ought to have
taken place before a mistrial was declared").

Here, the jury deliberated for at least 90 minutes
after the court's instruction and for approximately six hours
in total following a trial lasting eight days. Given the timing
of deliberation in this case, we cannot conclude that the trial
court abused its discretion when it decided not to declare a
mistrial. We reject defendant's third assignment of error.

Affirmed.